The petition set forth, in substance, that on August 13, 1896, the Cincinnati Street Railway Company, by virtue of certain *490 resolutions of the Board of Administration of the City of Cincinnati, adopted under and in pursuance of an act of the General Assembly of Ohio, passed April 26, 1895, known as the “Rogers Law,” rearranged its routes and was granted certain extensions of time upon its franchises and certain territorial extensions of its street railway routes; and that in connection therewith, and as a condition precedent and consideration for such grants and privileges, said railway company agreed to give, upon demand, to any person paying a cash fare, a transfer good for passage over routes extending in the same general direction ; and that such condition being duly accepted by said street railway company, became binding upon it and upon the associated defendant, the Cincinnati Traction Company, its lessee.'
That subsequently, by virtue of certain traffic agreements between the said traction company and certain interurban street railway companies, namely, the Cincinnati & Eastern Company and the Rapid Railway Company, whose rights in the premises have been assigned to and acquired by the Interurban Railway & Terminal Company, which is made a co-defendant, the latter company is operating cars from a terminal depot on Sycamore street to a point in Warren county, Ohio, and also to New Richmond, Ohio; that said cars use, in. the latter ease, a substantial portion of the so-called East End route, and in the former case portions of the so-called Walnut Hills cable route and the so-called Mt. Auburn cable route.
The petition then alleges that the defendant interurban companies, operating cars over the routes and parts of routes designated, refused to receive »for passage transfers given by the traction company, which would, by the terms of the Rogers Law resolutions, be good for passage over the route or routes so traversed; and that said Interurban Railway & Terminal Company, in the operation of cars over said tracks, refuses to .give transfers to routes of the traction company, as provided in said resolutions; and prays that the defendant be required to specifically perform the conditions of said Rogers Law resolutions of August 13th, 1896; or, in default thereof, that the operation of said cars be enjoined.
*491 The demurrer filed to said petition involves:
First. The objection of misjoinder as to (a) parties defendant, (b) causes of action, (e) separate causes of action against several defendants; and
Second. That the petition does not state facts sufficient in law to constitute a cause of action.
Following the course adopted by counsel in argument, we will consider the last mentioned objéotion first, because it raises the principal question in the case. As the demurrer admits the truth of the facts pleaded it must be assumed as true that the Interurban Railway & Terminal Company is operating cars over certain routes and tracks of the Cincinnati Traction Company, lessee of the Cincinnati Street Railway Company, in the city of Cincinnati, by virtue of certain agreements between themselves, and that these parties refuse to interchange transfers as required by the Rogers Law resolutions.
The full latitude allowed the various counsel in the argument and the extended ramifications of the various arguments adduced, render it impossible to follow these in detail within reasonable limits. We, therefore, confine ourselves to as succinct a statement of our views as possible, having regard to the difficulties of the subject.
By the terms of the Rogers Law resolutions as accepted and agreed to, the street railway company was “allowed to charge for each passenger by it carried one cash fare of five cents, subject to the giving of transfers,” as specified in said resolutions. The provision for transfers specified the various routes, and, in connection with each, certain other routes to which transferal should be givlen. Stated generally, the transferís specified were for the continuation of the ride over connecting routes, extending in the same general direction as the route on which the cash fare was paid. The provision begins with the requirement that “the Cincinnati Street Railway Company, its successors or assigns, shall upon demand upon the cars either at the time of payment of fare or within three minutes thereafter, issue transfers to its passengers who have paid the fare at the cash rate, and accept transfers good over its various *492 routes herein described as follows”—specifying the routes and connections as above stated.
It is clear beyond dispute, upon elementary considerations, that the traction company, as lessee of the Cincinnati Street Railway Company, is bound by all the conditions and obligations imposed by the Rogers Law resolution, under and by virtue of which the right to the occupancy and use of the streets of Cincinnati for street railway purposes is derived, and this is admitted by the defendants.
It would seem to follow, upon legal principles equally elementary, that the traction company, as lessee, could grant to a sub-lessee of its tracks and property no higher or greater rights of occupancy and use than it possesses; and that the sub-lessee could under no circumstances cognizable in equity, acquire >a higher right than that possessed by the lessee, because it dealt with the lesee with full knowledge of the legal relations and respective rights of the city, the street railway company, and the traction company, with reference to the subject matter, which were matters of public record. The sub-lessee would be bound also to take notice of the source, character and limitations of the power under which the street railway company or the traction company—both or either—assumed to grant to it a right to the use of tracks and of the streets through which they pass, because all are creatures of law and can act only as the law authorizes, and acquire only such rights as the law permits.
The law under which the contract involved in this case was made, as conceded by both parties, is the act of 1894 (Sections 3443-8 to 3443-13 of the Revised Statutes), commonly called the “Interurban Act.” This act provides:
First. For the occupancy, by street railways organized for the purpose, of highways outside of municipalities, by consent of abutting owmers and of -the authorities in charge.
Second. For the appropriation of private property where necessary.
Third. For leases, purchases and traffic arrangements with street railways in municipalities into or through which it is necessary or desirable to go.
*493 Fourth. For consolidation with such municipal street railways.
Fifth. For conforming the regulation and powers of such railways to those applicable to other street railways.
We are concerned in the ease chiefly with the third section of this act, which is as follows.:
“Revised Statutes, Section 3443-11 [Leases, purchases and traffic arrangements]. Such companies shall have power to lease, purchase or make traffic arrangements with any other street railroad company as to so much of its tracks and other property as may be necessary or desirable to enable them to enter or pass through any city or village upon the same terms and conditions applicable to other street railroads. And any existing street railroad company owning or operating a street railroad shall receive the cars., freight, packages:, or passengers of .any other road upon the same terms and conditions as they carry for the general public.”
The main question in the case arises upon the construction and meaning of this section. The language of the statute, upon first impression and considering the general status and relation of the interurban street railway to the municipal street railway, seems to mean this, namely: That while the primary object of the interurban road is to connect neighboring municipalities, yet, to avoid the inconvenience of transfer to municipal cars at the corporate boundaries, on the one hand, and to avoid, on the other hand, the unnecessary burdening of streets not already occupied by street railroads, the Legislature intended to give the interurban roads the required terminal facilities by permitting the municipal and interurban companies to enter into a contract whereby the municipal road in possession may share with the interurban road upon a consideration arranged between themselves, the franehises and privileges. already possessed by itself, with the interurban 'company.
Naturally, in accordance with reason and the principles of law governing parties and rights similarly conditioned, .this sharing of the right to use and occupy the streets and the tracks thereon for the operation of cars, must be subject to the terms and conditions governing the use of the right in the original possessor.'
*494 This would seem to be true even if no limiting words were introduced into the statute respecting the terms of the contract in this respect, because, on principle, a mere right given to a tenant to contract with a sub-lessee for a joint use must by implication be confined to such right of use as the primary lessee possesses.
It seems plain, therefore, that the words of Section 3443-11, “upon the same t.erms and conditions applicable to other street railroads,” mean, that the right to be shared is that—and that alone—which is possessed by the municipal company, and that the use acquired by the interurban company is to be governed by the terms and conditions governing a like use by the municipal company.
We are strengthened in this view by an admission of one of the counsel for the municipal companies: “The words ‘same terms and conditions,’ ” says the brief before us, “must, therefore, relate to means of transit and rates of fare as those matters exist over the line of railway selected and described by the traffic agreement.”
In the oral argument, other counsel while admitting that a lease or purchase would subject the interurban company to the obligations resting upon the municipal company, contended that a traffic agreement was quite a different thing and had no such legal effect. The reasoning upon which it was attempted to support this theory was not clear; and as the two propositions are inconsistent, we must understand the later expression in the brief as an abandonment of the former position. Its significance will be considered later.
There seems to be some confusion, however, in the use of the expression “traffic agreement.” The agreement is thus termed in the petition and in argument; but while the petition does not set forth its details, enough appears to show that under it the interurban company is using certain tracks of the municipal company for the operation of its cars to and from its own independent terminal depot in the city. A grant of such use is in the nature of a siib-leasing of the trades, and it seems a misnomer to call such an agreement .a “traffic agreement,” because the latter implies as >an essential condition an inter *495 change of commodities or passengers between the roads from one to the other. And it is this sort of an arrangement which seems to be covered by the latter part of Section 3443-11, which provides, in effect, that when the municipal road receives the cars, freight, packages or passengers of the contracting interurban road for transportation it shall do so upon the same terms and conditions as they carry for the general public.
The mere name which the parties give to their contract can in no wise alter its legal character or effect, which' is determined by the actual facts. In this ease the admitted fact is that the interurban company is operating its own cars and carrying passengers over the tracks of the municipal company— which is a character of use indicating, in effect, a leasing.
It is claimed by the city solicitor that Section 2505c, Revised Statutes—passed only four days later than the act already considered—also has application to the present controversy.
This provides, in substance, that a railway company organized to build or operate an electric railway from one municipality or point to another in this state shall be authorized to make an arrangement or agreement with a municipal street railway whereby the passenger cars of the interurban company may be operated over the trucks of the municipal company for such compensation as may be agreed upon, “upon the same conditions and for the same length of time” as those of the municipal company are operated; and be “subject to all the obligations imposed upon the municipal street cars”; that, in so far as the interurban ears use only the tracks of the municipal street railway, it shall not be necessary to obtain any additional grant or franchise other than that obtained by said agreement or arrangement; and provides that the “fare charged in the municipality shall not be greater than that fixed in the franchise held or owned by” the municipal street railway.
The defendants contend that this statute has no application because it is primarily designed for so-called commercial railroads—a contention based, largely, it would seem, upon the absence'of any qualifying word before “railway” in the opening *496 sentence; and, upon ,a passing dictum of Summers, J. (now of the Supreme Court), in State v. Dayton Traction Company, 18 C. C., 491 (497), in which he intimates—while disclaiming any purpose to construe the scope of the law—that it may refer to commercial railways only.
We do not deem it necessary here to determine this point, because the fact that these sections were under consideration by the Legislature at the same time, suggests—as Judge Summers also intimates—that they are not in conflict. But, if we accept the cited dictum of Judge- Summers, and if the construction we have indicated for Section 3443-11 be the true one, then, certainly, they do not conflict; because the Legislature was providing for contracts authorizing a municipal street railway to share its possession of streets with two classes of inter-municipal railways differing only in name but organized for substantially the same kind of traffic, namely, that between municipalities.
The fact, therefore, -of itself sheds light upon the intent and meaning of the Legislature in the earlier act; for we can not suppose any material difference was intended, because there were manifest reasons for granting the same but not different privileges. Mere differences in terminology are naturally to be expected where laws are drafted by different individuals.
It should be noted, however, that for aught that appears in the present case, the defendant interurban company may be of the class specified in Section 2505c rather than in 3443-11 for it is a fact of common knowledge that very many of our interurban railways distinctly avoid occupying the highways outside of the municipalities, but build upon private rights of way acquired by purchase, in order to operate at higher speeds and avoid the liability of -accidents incident to highway occupancy.
There are but few expressions upon the purpose and scope of the law in question that appear in print, and these do not throw direct light upon the question under consideration. In State v. Traction Company, 64 O. S., 272 (281), Judge Shauck refers to the general definition of street railways as immaterial—
*497 “In view of recent legislation in which the term is applied to roads 'constructed upon 'highways—interurban as well as urban—the only requirement being that in construction and operation they shall be consistent with the former and ordinary use of such highways. * * * It is well known that in response to a general demand for increased traffic facilities between cities and the regions surrounding them that the act of May 14, 1894, now cited as Sections 3443-8 to 3443-13, Revised Statutes, was enacted.”
In City of Hamilton v. C. & H. Electric Company, 5 N. P., 557, it was held that Section 3443-11 presents merely an alternative mode of entering the city. “This” (section), said the court, “may in some sense enlarge the rights of a road built wholly without a municipal corporation, but it would not prevent a road under a proper charter from -building into the city.”
In an opinion of the attorney-general cited to us from 39 Bui., 113 (115), it is held that .-an interurban company entering a municipality by virtue of the section under consideration “at once becomes subject to the statutory regulations and municipal control of (applicable to) street railroads proper.”
It is contended that the city has no right to sue because it is not a party to the so-called -traffic agreement; but we do- not understand that the suit of the city is based -directly upon the traffic agreement. The city entered into contract relations with the street railway company whereby it granted to it and its assigns certain privileges of operating street cars in the streets upon certain conditions. It is conceded that the traction company, lessee, stands in the shoes -of the street railway company, The Legislature meantime granted .authority to the traction compiany to take a partner or sub-lessee under its contract with the city, with whom it is authorized to share its rights and obligations pro tanto. The traction company and interurban companies by virtue -of this authority and with full knowledge of the conditions, entered into the arrangement whereby the interurban company became, in effect, a second party with the traction company to the franchise:contract under which alone the privilege to use the streets was obtained. This suit therefore is based, not upon the traffic contract, but upon the vol *498 untary assumption of rights and the corresponding obligations, under the franchise-contract by the interurban company as one of the contractual assigns of an integral part of. the original franchise.
The law under which the traction company assumed to grant, and the interurban companies assumed to accept and exercise, the privileges held by the traction company, and by which alone such transfer of rights is authorized, is part of the agreement whether so expressed in the terms of the latter or not. The law was its sole source and inspiration and it could have no validity otherwise. The acceptance of these privileges wafe also the acceptance of the obligations attaching to them; and the contract itself was therefore in effect a contract made for the benefit of a third party, namely, the public in its municipal capacity which granted the easement or franchise which is being used. Weil v. The State, 46 O. St., 450 (453).
The case, therefore, as it seems to us, falls directly under the language of Section 1777, Revised Statutes, authorizing the city solicitor to sure in the name of the corporation, and, “whenever an obligation or contract made on behalf of the corporation granting an easement or creating a public duty, is being evaded or violated, apply for the forfeiture or specific performance of the same as the nature of the case may require,” or for an injunction, as provided earlier in the section.
We have adverted to the admission of counsel for defendants that the contract in question subjected the interurban company to the same conditions as to rates of fare to be charged as were obligatory upon the traction company. This is a virtual admission that the transaction, in effect, brought the interurban company into relations of privity with the city in respect of the franchise contract which established such obligation.
But the fare charged'under the franchise granted by the Rogers Law resolutions was defined as a condition of the grant under which the municipal street railway and its assigns were obligated to transport a passenger paying a specified cash sum, not only upon the route upon which he was then going, but a further distance on a connecting route continuing in the same *499 general direction, upon liis demanding such right. The continued journey, upon demand, is the consideration for the cash fare paid. To cut off half the r-ide -is, in effect, to double the fare; as much so as if a railway company having contracted to carry a passenger from one terminal to the other of a given route, were to collect the entire fare upon the first half and then demand a second fare for the latter half of the route.
It is idle, as it seems to us, to claim that the ride upon a transfer under the franchise in question is a mere' “privilege” intended for municipal passengers only, which constitutes no part of the consideration for the fare, and which may be omitted without violating the terms of the contract when transporting a passenger w'ho may come into the city from extra-urban territory. That the contention is not sound is shown, moreover, by the admitted fact that the interurban cars operating over the municipal tracks do also a purely municipal business—although this is claimed to be incidental to the main purpose of transporting interurban passengers.
But it is also admitted that these municipal passengers are denied transfers, and it is manifest, therefore, that the proposed principle of classification is a one-sided -doctrine that does not work in favor of the public but only against it. It does not break the force of this -obvious deduction to say that the use of interurban -ears by the municipal public is “voluntary.” This can -only mean that the municipal public use the interurban ears within the corporation, knowing that transfers are refused— which begs the question. It is obvious that the theory of separate public rights in respect of transportation over municipal tracks is too shadowy for practical enforcement.
"We find no warrant, in the legislation providing for intra and extra-urban railroads, for the theory of classification of municipal and interurban passengers on any such basis as would discriminate in favor of one and against the other, as contended in argument, with respect to rights of transportation on municipal street railroads. On the contrary-, as the rights in question emanate from the same source, to-wit, the state, representing the people in their sovereign capacity, we must suppose an intention to grant the same rights to all.
*500 Such, in effect, we find and construe to be the meaning of the specific language of the statute under consideration, namely, an expression of legislative intent that interurban passengers brought into the city over municipal trackways controlled by municipal street railways, shall not be discriminated against, but shall have exactly the same rights of transportation within the city as residents.
Entertaining these views, we must overrule the demurrers as to the main grounds stated.
The other grounds, viz., of misjoinder of defendants and of causes of action, seem to ignore the statement of the petition admitted by. the demurrer to be true—that the rights of contract acquired by the Rapid Railway Company and the Cincinnati & Eastern Railway Company have been assigned to the Interurban Railway & Terminal Company. This would in effect be a merger of two contracts of the same nature in one defendant, which, therefore, becomes in effect one contract for the purposes of this suit; or, in another aspect, brings two causes of action into such relation as that they may be combined in one suit. The merger of the rights acquired by the separate interurban companies in the terminal company, makes the latter company the real party defendant in interest, and leaves the original contracting interurban companies nominal parties only. The demurrers are therefore overruled on these grounds also.
As the sole questions involved in this litigation are raised and determined by these demurrers, a decree will be entered in behalf of the plaintiff and against the defendants substantially as prayed, the precise terms of which, in case counsel can not agree, will be settled by the court upon presentation of drafts by counsel.
Demurrers overruled, and judgment for plaintis granting the prayer of the petition.